UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PATRICIA HAGANS,

                Plaintiff,                           Case No. 2:08-cv-850
                                                JUDGE GREGORY L. FROST
      v.                                Magistrate Judge E.A. Preston Deavers

FRANKLIN COUNTY
SHERIFF'S OFFICE, et al.,

                Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' motion for summary judgment (ECF No. 51), Plaintiff's memorandum in opposition (ECF No. 52), and Defendants' reply memorandum (ECF No. 56). For the reasons that follow, this Court finds the motion not well taken.

## I. Background

At approximately 5:37 a.m. on May 13, 2007, Columbus, Ohio resident Robert Bogard called 911 and reported a disturbance outside his home. Police units were dispatched, and Valleyview Police Officer Nelson Frantz was the first officer to arrive at the scene. Frantz heard screaming when he arrived and immediately encountered a shirtless Patrick Hagans ("Hagans") running toward him. Frantz ordered the unintelligible Hagans to stop, but Hagans continued running about and yelling in what Frantz describes as an uncontrollable rage. Frantz warned Hagans that he would utilize mace if Hagans continued to disobey the officer's verbal

1

commands.  After an unsuccessful mace attempt, Hagans fled from Frantz and jumped over a fence, falling onto his back.

Franklin Township Officer Troy Hughes and Franklin County Deputy Sheriff Jason Ratcliff also responded to the call.  Hughes arrived at the scene before Ratcliff and proceeded to exit and lock his cruiser.  While doing this, Hughes observed a screaming Hagans running toward him.  Hagans attempted to gain access to Hughes' locked vehicle, pulling at the driver's side door.  Hughes ordered Hagans to cease this activity, but Hagans ignored him.  Hughes then grabbed Hagans by the shoulders.  Hagans responded with additional flailing and screaming. When Hughes picked Hagans up by the waist, both men fell to the ground.  Hagans grabbed Hughes' flashlight, which Hughes managed to wrestle away from Hagans.

The situation quickly escalated.  Ratcliff arrived at the scene and, proceeding around the side of an adjacent house, encountered a rifle-wielding Bogard outside his residence.  Hearing screaming from the front of the house, Ratcliff proceeded toward the source of the screaming and found Hughes struggling with Hagans on the ground.  Another officer, Franklin Township Officer Terry Taylor, had also arrived while Hughes struggled with Hagans, whom he described as kicking, swinging his arms, and yelling unintelligibly.  Taylor aired that there was a "resister" over the radio, which led to the dispatch of a medical squad.  Taylor attempted to pepper spray Hagans, but his pepper spray was not working.

Hughes, joined by Frantz, struggled to subdue Hagans on the ground.  Within a minute of his arriving at the scene of the struggle, Ratcliff elected to use his Taser on Hagans, who was on his stomach as the other two officers attempted to subdue him.  Ratcliff applied the Taser in drive stun mode directly to Hagans' upper-middle back, between Hagans' shoulder blades, for

2

what he estimates as one to two seconds.  Hagans reached back to grab the Taser, and Ratcliff applied a second drive stun charge to Hagans.  Neither Taser application caused Hagans to cease his resistance.  Ratcliff then attempted to use the Taser in dart probe deployment mode, but he missed Hagans.  At this point Ratcliff used the Taser twice more on Hagans in drive stun mode for an estimated one to two seconds of direct contact per application.

Despite the four Taser contacts, the still face-down Hagans continued to struggle with the officers.  Ratcliff then joined Hughes and Frantz in attempting to physically subdue Hagans, and after twenty to thirty seconds of additional grappling on the ground, the officers were able to handcuff Hagans.  A struggling Hagans continued to yell and kick, and the officers proceeded to place leg shackles on him.

The dispatched medical squad arrived at the scene.  Within five to ten minutes after the squad's arrival, Hagans went into cardiac arrest and stopped breathing.  The squad performed emergency procedures and transported Hagans to a local hospital.  Hagans was admitted in critical condition and, after three days of never fully regaining consciousness, he passed away.  Subsequent investigation uncovered that Hagans and his live-in girlfriend were smoking crack on May 13, that Hagans had locked himself in their residence's bathroom, and that Hagans had then broken a window and jumped out of the bathroom, leading to his running around screaming and Bogard calling the police.  After an autopsy, the Franklin County Coroner's Office ruled that the cause of death was bronchopneumonia as a consequence of anoxic encephalopathy as a consequence of cocaine intoxication.  Toxicology detected the presence of cocaine in Hagans' blood and urine.

Plaintiff, Patricia Hagans (the administratrix of Hagans' estate), subsequently initiated an

action in the Franklin County Court of Common Pleas on August 11, 2008. (ECF No. 4.)

Defendants removed the action to this Court on September 11, 2008. (ECF No. 2.) In her

Complaint, Plaintiff asserts federal claims under 42 U.S.C. § 1983 and state law claims under

Ohio Revised Code § 2744.03(A)(6). (ECF No. 4 ¶¶ 1-29.) Defendants Franklin County

Sheriff's Office, Franklin County Sheriff James Karnes, and Ratcliff filed a motion for summary

judgment. (ECF No. 51.) The parties have completed briefing on that motion and, following

post-briefing supplementation of the record by both sides to correct a deposition filing issue, the

motion is now ripe for disposition.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party

who has the burden of proof at trial fails to make a showing sufficient to establish the existence

of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United

Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the

nonmoving party, which must set forth specific facts showing that there is a genuine issue of

material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A

genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

4

verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.  Analysis

Defendants first move for summary judgment on Plaintiff's 42 U.S.C. § 1983 claims. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, in order to assert valid § 1983 claims, Plaintiff must show that, while acting under color of state law, Defendants deprived Patrick Hagans of a right secured by the Federal Constitution or laws of the United States.  *See Alkire v. Irving,* 330 F.3d 802, 813 (6th Cir. 2003).

At the core of Plaintiff's § 1983 claims is the allegation of excessive force by Ratcliff. The officer in turn moves for summary judgment on the grounds that he is entitled to qualified immunity on the claims asserted against him in his individual capacity and that the amount of force involved here was reasonable, thereby precluding any deprivation of a constitutional right.

The doctrine of qualified immunity operates under certain circumstances to shield from

civil liability governmental officials, such as police officers, who are performing official duties. *Sinick v. Summit*, 76 F. App'x 675, 679 (6th Cir. 2003). The affirmative defense is meant to safeguard an official's proper decision-making process and offers that party potential relief from frivolous suits. *See D'Agastino v. Warren*, 75 F. App'x 990, 993 (6th Cir. 2003).

The Sixth Circuit has explained that qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In addition to shielding officials from liability, qualified immunity may entitle the official not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court has instructed lower courts to use a distinct analysis to determine whether the application of qualified immunity is warranted. In addressing the potential applicability of qualified immunity, courts therefore traditionally followed a sequential inquiry: "First, the court considers whether, on the plaintiff's facts, there has there been a violation. Second, the court considers whether that violation involved 'clearly established constitutional rights of which a reasonable person would have known.' " *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)); *see also Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). This analytic approach has at times also been characterized by various appellate panels as a three-part inquiry in which a court must ask:

> 1) has a constitutional violation occurred; 2) was that right a clearly established right of which a reasonable person would have known; and 3) has the plaintiff alleged sufficient evidence to indicate that what the official allegedly did was objectively

unreasonable in light of the clearly established constitutional rights?

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).  *See also Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (restating test); *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991) ("A public official is entitled to qualified immunity for conduct in performing discretionary functions so long as that conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known.").  Other appellate panels have found the third step to be redundant in excessive force cases. *Kijowski v. City of Niles*, 372 F. App'x 595, 598 n.7 (6th Cir. 2010).  Regardless of this point, courts have relatively recently been permitted to depart from the sequential analysis and address either prong of the two-part qualified immunity inquiry first. *Williams v. Ingham*, 373 F. App'x 542, 547 (6th Cir. 2010); *Kijowski*, 372 F. App'x at 598.

It is also important to note that the doctrine of qualified immunity recognizes that an officer can be found to have violated the constitution, but still be granted immunity for *reasonable* mistakes as to the legality of his or her action.  *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  The reasonableness of such mistakes is inherently dependant upon the clarity of the legal constraints governing particular police conduct.  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In determining whether a defendant is entitled to qualified immunity, "[t]he ultimate burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity." *Wegener*, 933 F.2d at 392. *See also Russo v. City of Cincinnati*, 953 F.2d 1036,

7

1043 (6th Cir. 1992).  Further, "[w]hen ruling on qualified immunity, the district court should indicate the clearly established right at issue and the factual basis for its conclusion that a genuine issue exists as to the commission of acts violating that right." *Wegener*, 933 F.2d at 392 (citing *Poe v. Haydon*, 853 F.2d 418, 423-24, 426 (6th Cir. 1988)).

The Court will therefore begin its analysis by examining whether a constitutional violation has occurred.  In their briefing, Defendants concede that Hagans had a constitutional right to be free from unreasonable seizures, but then argue that "the more particularized and relevant inquiry in this case is whether it was clear to Ratcliff that his conduct in applying four brief Taser drive-stun applications to a physically combative and actively resisting subject violated Hagans' rights."  (ECF No. 51, at 14.)  Defendants assert that "actively resisting subjects do not have a clearly established right to be free from four very brief Taser drive stun applications."  (ECF No. 51, at 15.)

Defendants' sweeping answer to their narrow framing of the central issue in this litigation ignores the nuances of the necessary inquiry.  Prior to the events as alleged in Plaintiff's complaint, the United States Supreme Court established that the use of force is unconstitutional if it is excessive under objective standards of reasonableness.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  It was settled that at the time of the underlying events here that the use of force must be reasonable; if no force was required, then no force was necessary.  *See id*. at 394; *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997) (citing *Adams v. Metiva*, 31 F.3d 375, 384-85 (6th Cir. 1994)).  There does not have to be precedent directly addressing four Taser applications for the right to be free from four unnecessary Taser applications to be clearly established.  Rather, it is well settled that " '[a]lthough it need not be

8

the case that "the very action in question has previously been held unlawful, . . . in the light of

pre-existing law the unlawfulness must be apparent." ' "  *Kijowski v. City of Niles*, 372 F. App'x

at 601 (quoting *Russo*, 953 F.2d at 1042).  Consequently, " '[a]n action's unlawfulness can be

apparent from direct holdings, from specific examples described as prohibited, or from the

general reasoning that a court employs.' " *Id.* (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th

Cir. 2003)).

       In light of the foregoing and cognizant of the applicable summary judgment standard that

must control today's analysis, this Court is not able to agree with Defendants that no

constitutional violation occurred based on the absence of a clear right to avoiding four Taser

applications.  In some circumstances, four Taser applications may be warranted, while in other

circumstances, four Taser applications would be a constitutional violation.  Context controls

such a determination given that whether the amount of force used was unreasonable (and thus

violated the clearly established right implicated) "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight."  *Ewolski v. City of Brunswick*,

287 F.3d 492, 507-08 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396).  *See also D'Agastino*, 75

F. App'x at 994.  The clearly established right here is the right to be free from excessive force,

and precedent teaches that such a right can at times foreclose multiple Taser applications.  *See*

*Roberts v. Manigold*, 240 F. App'x 675, 678 (6th Cir. 2008 ) (citing in a multiple taser

applications case *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002), for the proposition that

"an officer's 'use of pepper spray [on a suspect actively resisting arrest] might be . . . excessive

force under *Graham*' ").  In *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008), for example, the

Sixth Circuit addressed a scenario in which, in addition to other conduct, an officer employed a

Taser against a suspect four times in an effort to subdue the man and place him into handcuffs.

The court of appeals recognized that

> the officers [involved] should have known that the gratuitous or excessive use of a
> taser would violate a clearly established constitutional right.  Even without precise
> knowledge that the use of the taser would be a violation of a constitutional right, the
> officers should have known based on analogous cases that their actions were
> unreasonable.

*Id.* at 463 (citations omitted).  The same fundamental rationale applies here, where Ratcliff is

charged with adhering to Hagans' right to be free from excessive Taser applications.

Ratcliff alternatively argues that even if a clearly established right to be free from

multiple Taser applications exists, he nonetheless is entitled to summary judgment because his

actions were objectively reasonable.        A great deal of discretion is afforded police officers

when evaluating reasonableness in such situations so that "[i]f the officer's mistake as to what

the law requires is reasonable . . .[he] is entitled to the immunity defense." *Magrum v. Meinke*,

332 F. Supp. 2d 1071, 1078 (N.D. Ohio 2004).  *See also Greene*, 310 F.3d at 894 ("A police

officer may be entitled to qualified immunity, obviously, even though he has in fact violated the

plaintiff's rights; 'reasonable mistakes can be made as to the legal constraints on particular police

conduct.'" (citations omitted)).  Accordingly, to determine whether qualified immunity applies,

this Court must determine whether Ratcliff's conduct was reasonable as a matter of law.

Courts have recognized the difficulty of this determination, stating that

> ascertaining the reasonableness of force used is not capable of precise definition or
> mechanical application, [and] the analysis focuses on the specific facts of each case,

10

> "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."

*Magrum*, 332 F. Supp. 2d at 1078 (quoting *Graham*, 490 U.S. at 396). The *Magrum* court goes on to state that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The "objective reasonableness standard" applied in this inquiry asks whether a reasonable officer would conclude that the level of force used was appropriate. *Graham*, 490 U.S. at 396-97. This standard balances the cost to the individual against the government's interest in effectuating a seizure; it contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396 ). In light of this standard and necessarily resolving all inferences in Plaintiff's favor, this Court must recognize that in large part Ratcliff's own deposition testimony defeats his reasonableness argument in the summary judgment context, even if not all of the factors weigh against summary judgment.

Defendants state in their briefing that "[t]he responding officers had no information regarding the severity of the crime at issue." (ECF No. 51, at 17.) The crimes with which Hagans was ultimately charged, resisting arrest and disorderly conduct, are notable but not so serious as to necessarily warrant the force employed if no such force was needed.

Perhaps more significant is the issue of whether Hagans posed an immediate threat to the safety of the officers on the scene or others. Ratcliff recognizes this factor and testified at his deposition as follows:

Q.  But in – in deciding on the type of force that you should use, do you have to consider the amount of potential harm that the suspect poses to the officer or to other people?

A.  Yes.

(Ratcliff Depo. at 101.)  Ratcliff subsequently testified at his deposition that he did not observe

Hagans to have any weapons.  (Ratcliff Depo. at 123.)  The officer also testified as follows:

Q.  Did you hear [Hagans] make any threats?

A.  No.

Q.  Did he land any punches or kicks on the other officers?

A.  Not that I observed.  I don't know what happened prior to me getting there.

(Ratcliff Depo. at 127-28.)  Ratcliff later continued:

Q.  Up until the time that you released your taser from its holster, had Mr. Hagans struck any of the officers with any parts of his body?

A.  Not that I had observed.

Q.  Were any of the officers bleeding?

A.  I – I – not – nothing obvious.

Q.  Okay.

A.  Unless it was a scrape or something.

Q.  Did they appear to be injured in any way?

A.  No.  No.

(Ratcliff Depo. at 129.)  Ratcliff thereafter testified:

Q.  Did [Hagans] say anything physically threatening toward you or the other officers?

A.  Not towards myself.

Q.  What about the other officers?

A.  I don't know.  Prior to me getting there, I don't know what was said or when.

(Ratcliff Depo. at 134.)  Given such testimony and necessarily resolving all reasonable

12

inferences in Plaintiff's favor, there is at best a fact issue as to whether Hagans posed a safety risk necessitating one or more Taser applications.  A reasonable jury might conclude that Hagans' continued resistance presented a safety threat necessitating the force employed, or that jury might conclude that it did not and that Ratcliff exceeded constitutionally permissible action. *See Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("Quite simply, though the initial use of force (a single Taser shock) may have been justified, the repeated tasering . . . was grossly disproportionate to any threat posed and unreasonable under the circumstances.").  This is a case in which "the totality of the circumstances, not the first forcible act, . . . determines objective reasonableness." *Id.*

There is no factual issue as to whether Hagans was actively resisting arrest.  He was, with this one factor notably weighing in Ratcliff's favor.

Less helpful to Ratcliff for summary judgment purposes is the fourth factor, whether Hagans was attempting to evade arrest by flight.  Ratcliff testified as follows:

> Q.  Is it fair to say that before you first applied the taser there was not much risk that Patrick Hagans was going to get away?
> A.  Yes.

(Ratcliff Depo. at 130.)  Additional testimony by Ratcliff went to the core issue of the reasonableness of the force he employed:

> Q.  Before you used your taser, Deputy Ratcliff, did you consider whether the four of you, Officer Frantz, Officer Taylor, Officer Hughes, and yourself were capable of subduing Mr. Hagans without using any weapons?
> A.  No.  Because the use of the taser was perfectly justified.  And we're always taught to stay one step ahead of the suspect and to always consider officer safety.

(Ratcliff Depo. at 131.)  Ratcliff also testified:

13

Q.  Okay.  For what reason did you believe it was necessary to use a taser on Mr. Hagans?

A.  Because the use of force continuum had been exhausted up until that point and it was not successful.

Q.  And what was your purpose in using it on Mr. Hagans at that point?

A.  To try and achieve pain compliance to get his arms out from underneath him so we could get him handcuffed.

(Ratcliff Depo. at 140.)

Much of Ratcliff's own deposition testimony undercuts his reasonable conduct or reasonable mistake thesis.  Taking into account the totality of the circumstances, this Court cannot say that Ratcliff's actions were objectively reasonable as a matter of law, which is the standard involved here.  *See Kijowski*, 372 F. App'x at 600.  The chaotic scenario that unfolded on May 13, 2007, presents a close call.  These are facts that may or may not constitute a scenario under which Hagans appeared to pose a threat to the officers or otherwise warranted multiple Taser applications.  Such possible interpretations disfavor Defendants' motion, given that "summary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations."  *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).  Moreover, "[t]his principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony–the victim–cannot testify."  *Id.*

A reasonable jury could conclude based on these facts that the obviously troubled and apparently unarmed Hagans was instead merely problematic and that under the circumstances and despite the uncertain nature of the encounter, the specific force employed was unreasonable.  *See id.* (noting in a distinguishable fact  that "general bedlam does not necessarily justify the use

14

of force against any particular individual"); *see also Landis*, 297 F. App'x at 465 ("This court

has found that '[e]ven if a situation is "tense, uncertain, and rapidly evolving," that does not

innoculate an officer from a charge that he crossed the line from subduing an individual to

assaulting him.' " (quoting *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008)).

The Sixth Circuit's reasoning in *Landis* supports this conclusion:

> A determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that [the deceased] was either on drugs or mentally unstable and they knew that he was unarmed. *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001) (the mental illness of a suspect is also a factor to be considered in determining the reasonableness of the force employed). Thus, the Defendant officers should have approached the situation with [the deceased] bearing this fact in mind. *Id.* (different tactics should be employed against an unarmed, emotionally distraught individual who is resisting arrest or creating disturbance than would be used against an armed and dangerous criminal who has recently committed a serious offense); *Marsall v. City of Portland*, No. CV-01-1014-ST, 2004 WL 1048127, *11, 2004 U.S. Dist. LEXIS 8764, *33 (D.Or. May 7, 2004) ("when police are confronted by an unarmed, emotionally distraught individual who has committed no serious crime, as opposed to an armed and dangerous criminal, the governmental interest in using force is diminished, not strengthened, even when the suspect is irrational and inviting the use of force").

*Landis*, 297 F. App'x at 465. There is thus no bright line rule as Defendants argue against in

stating that they "are unaware of any case that holds a Taser may never be used on a suspect who

appears to be either mentally ill or under the influence of drugs/alcohol." (ECF No. 51, at 20.)

Such a rule would be foolish. But there is a rule that the state of individuals such as Hagans

reasonably factors into an excessive force (and therefore also into a qualified immunity) inquiry.

Accordingly, the Court finds the motion for summary judgment not well taken in regard to the

excessive force claim.

Defendants also seek summary judgment on Plaintiff's derivative failure to train claim.

It is well settled that *respondeat superior* cannot provide a basis for liability on this claim.

*Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Thus, to satisfy her burden, Plaintiff must demonstrate the existence of and impropriety of an involved policy. This is because the Sixth Circuit has explained:

> Municipalities are not ... liable for every misdeed of their employees and agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §§ 1983." [*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978).] This circuit has stated that to satisfy the *Monell* requirements a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987) (adopting the test articulated in *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984) (en banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)).

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993). What constitutes a *Monell* policy or custom is therefore most often of critical import to § 1983 actions such as the case *sub judice*. The United States Supreme Court has held:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). The Sixth Circuit has discussed this possibility:

> A city may also be liable, in narrow circumstances, for failure to train its officials, if that failure gives rise to a clearly foreseeable violation of constitutional rights reflecting deliberate indifference to them:
>
> > "[I]t may happen that in light of the duties assigned to specific officers or

16

> employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."

*Sell v. City of Columbus*, 47 F. App'x 685, 691-92, (6th Cir. 2002) (quoting *City of Canton,* 489 U.S. at 390 (footnotes omitted)). The ultimate focus "[i]n resolving the issue of a [municipality's] liability, . . . must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390.

Defendants first argue that because qualified immunity protects Ratcliff from the excessive force claim, the failure to train claim necessarily fails. Because the issue of qualified immunity has not proven dispositive of the excessive force claim, however, this Court must proceed to address Defendants' alternative argument that there is no deliberate indifference here.

In support of their motion, Defendants assert that "[t]here is no evidentiary support in the record that the Taser training provided to Franklin County deputies is deficient in any respect." (ECF NO. 51, at 25.) Record evidence calls this proposition into doubt. Ratcliff testified at his deposition that he was unaware that continuous Taser exposure presented a cumulative risk to an individual and described his training in regard to multiple Taser applications as follows:

> Q. Okay. Does the Franklin County Sheriff's Department have any written policies about how many times a taser can be discharged on a single individual?
> A. You mean like a certain number, like you can only do it this many times or –
> Q. Yeah.
> A. No.
> Q. No, they don't have a policy?
> A. Not – not that I'm aware of that limits how many times it can be used, no.

Q. So as – on May 13th, 2007, am I correct in understanding that you were not aware of any limitations that you had with respect to the number of times that you could use this weapon on a specific individual?

A. There's no certain number, just whatever is reasonable and justifiable to get the suspect under control.

(Ratcliff Depo. at 90-91.) Ratcliff later testified:

Q. So this would be your own personal policy about how many times that you could use the taser, it wasn't a written policy?

A. It's not a written policy, no.

Q. Okay. Was there any part of your training that included a discussion about how many times you could use the taser?

A. No.

(Ratcliff Depo. at 93.) Again returning to the issue of his training, Ratcliff testified:

Q. Were you instructed not to use multiple firings under certain circumstances?

A. Multiple firings?

Q. Yeah.

A. Not that I can recall from my training, no.

Q. Were you ever made aware of any dangers associated with repeated firings of the taser?

A. Repeated firings? No.

(Ratcliff Depo. at 94.) The officer later testified:

Q. Were you ever taught that a shock from a taser M-26 weapon was capable of producing a cardiac arrhythmia?

A. Not – I'm not aware, I don't believe that was covered in training, that I know of.

(Ratcliff Depo. at 163.) Such testimony, coupled with the testimony of Dr. Michael Lyman, Plaintiff's expert, regarding the risk presented by multiple Taser applications, presents an issue of fact as to the adequacy of the training program in relation to the tasks officers must perform.

Defendants posit that Ratcliff's recollection of his training fails to demonstrate its lack of necessary completeness. They also posit that the policy that "whatever is reasonable and justifiable to get the suspect under control" in regard to multiple Taser applications is sufficient. (ECF No. 51, at 26.) A jury will properly decide the contested issue.

This is because in light of the duties assigned to law enforcement officers such as Ratcliff, a reasonable jury could potentially conclude that the need for more or different training on the multiple applications issue is so obvious, and the apparent inadequacy of the existing training so likely to result in the violation of constitutional rights, that the defendant policymakers can reasonably be said to have been deliberately indifferent to the need. A failure to provide proper training may therefore fairly be said to represent a policy for which the County Defendants are responsible, and for which they may be held liable if it actually caused Hagans constitutional injury. The officer's Taser training may reflect deliberate indifference to the constitutional issues that exist. Consequently, Defendants are not entitled to summary judgment on the *Monell* claim.

Defendants' final argument in regard to the federal claims is that Plaintiff cannot prove that the Taser applications proximately caused Hagans' death. Their argument asks this Court to weigh the selectively parsed testimony of Dr. Jeffrey Breall, Plaintiff's medical expert, as evident in their conclusion that "[t]aken collectively, [the expert's] testimony is contrary to his conclusion that four drive stun applications to Hagans' back caused his death." (ECF No. 51, at 29.) In this limited summary judgment context, the Court cannot function as a factfinder and disregard any portion of the expert testimony proffered in favor of other testimony provided. Defendants' argument fails to take the issue from the jury.

19

This leaves Defendants' arguments for summary judgment on Plaintiff's state law claims for assault and battery.  Ohio law provides that the tort of assault consists of

> the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact.  The threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching. An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact.

*Stevens v. Provitt*, No. 2002-T-0076, 2003 WL 23097088, at *3 (Ohio App. 11 Dist. Dec. 31, 2003) (quoting *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 406, 614 N.E.2d 1148, 1154 (1993)).  The tort of battery exists when a person acts with the intent to cause a harmful or offensive contact and such a harmful contact actually results.  *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99, 524 N.E.2d 166, 167 (1988) (citing Restatement of the Law 2d, Torts (1965) 25, Section 13).

Defendants argue that they are entitled to immunity under Ohio Rev. Code Chapter 2744. That Chapter creates a presumption of immunity for political subdivision employees, subject to the following exceptions :

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.  Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Ohio Rev. Code § 2744.03(A)(6).  Directing the Court to these exceptions, Plaintiff argues that § 2744.03(A)(6)(b) applies to defeat immunity here.

The same dispute that precludes summary judgment on the § 1983 excessive force claims also precludes summary judgment on these state law claims.  If the jury concludes that Ratcliff acted with excessive force and that he was more than merely negligent, then the jury could conclude that Ratcliff acted unreasonably.  Such action could constitute an act done with a malicious purpose, in bad faith, or in a wanton or reckless manner to paraphrase the § 2744.03(A)(6)(b) immunity exception.  Necessarily constrained to view the facts in Plaintiff's favor, this Court is must conclude that the § 2744.03(A)(6)(b) exception defeats reliance on immunity to obtain summary judgment on Plaintiff's assault and battery claims.

### III.  Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion for summary judgment.  (ECF No. 51.)

**IT IS SO ORDERED.**

   /s/  Gregory L. Frost        

GREGORY L. FROST

UNITED STATES DISTRICT JUDGE
